**ELMORE'S VARIETY STORE and Genesco, Inc., Appellants,**

v.

**Mrs. Mildred E. WHITE, Appellee.**

Supreme Court of Tennessee.

July 5, 1977.

Billy C. Jack, Columbia, for appellants.

Jerry W. Wallace, Pulaski, for appellee.

OPINION

HARBISON, Justice.

In this workmen's compensation case the single issue on appeal is whether or not there was sufficient medical testimony to establish a causal connection between an ankle injury sustained by the employee and a later subarachnoid hemorrhage which resulted in her total permanent disability. The trial judge held that there was a causal connection, and we find substantial material evidence to support his conclusion.

The employee, Mrs. Mildred E. White, was 61 years of age and was regularly employed as a saleslady in a variety store in Pulaski, Tennessee when she was injured. There is no evidence in the record of her having any previous serious illness. On November 7, 1975 a bicycle fell in the department store and the kick-stand struck her ankle, apparently causing a fairly painful and severe puncture wound. A bloodclot, or hematoma, developed at the site of this injury. Mrs. White was seen by Dr. W. J. Johnson, a general practitioner in Pulaski, on November 14 and November 29, 1975. On the latter date the hematoma was lanced and a dressing applied. On December 1, 1975 the employee returned to Dr. Johnson's office. There the dressing on her wound was changed, and while the nurse was in the process of doing this, the employee became faint and nauseated. She also felt the onset of a severe headache. She was examined by Dr. Johnson. He found all of her vital signs normal, and felt that she needed some fresh air. He permitted her to return to her home, and she drove her automobile, accompanied by her mother. She testified, however, that she began to feel a severe stiffness in her neck on the way home, to such an extent that she could not turn her head and had to request her mother to assist her in watching for other automobiles. During that day and the next she continued to suffer from nausea, headache and stiffness of the neck. She returned to Dr. Johnson's office on December 3, and at that time he at once recognized that she had suffered a subarachnoid hemorrhage. He referred her to another physician in Pulaski, and the latter arranged for her to be examined on that same day by Dr. W. H. Bell, a neurosurgeon in Huntsville, Alabama.

Testifying in person at the trial, Dr. Johnson stated that he was of the opinion that an aneurysm on a blood vessel in the brain of the patient had weakened or burst while she was undergoing treatment in his office, and that the onset of the subarachnoid hemorrhage occurred at this time. He stated several times under examination by the Court and by counsel that he felt that

there was a causal connection between the treatment being administered to Mrs. White for her work-related injury and the breaking of the aneurysm. He testified that excitement, pressure or tension, in his opinion, could cause the rupture of an aneurysm. In response to questions by the Court, Dr. Johnson testified:

"Q. Well, let me just flat out ask you this, Doctor. Can you, is this related to the injury? Would this injury that she received to her ankle have caused the rupture of the blood vessel?

"A. Probably so, I'd say that, probably so.

"Q. How, Doctor?

"A. Well, sometimes it can rupture any time. You know, a thing like she's got the aneurysm there and a little excitement or anything like that, exertion, any thing like that can cause the aneurysm to rupture."

Under examination by counsel, Dr. Johnson expressed the opinion that the original injury and the resulting treatment which the patient was undergoing "aggravated" the aneurysm. He testified:

"This lady was on the table there, the nurse was dressing her wound and she was looking at it and she fainted and she got sick right there at that time. I'll say this, that this aneurysm started right then when she was dressing her wound and she was undergoing stress and it sounds to me like, it sounds to me like that her looking there seeing the bloody drainage and seeing the puss that could probably cause your ruptured aneurysm."

Dr. Bell testified essentially to the same effect, stating that worry, apprehension or stress to a patient could cause the rupture of a pre-existing aneurysm. Like Dr. Johnson, he expressed the opinion that the onset of the subarachnoid hemorrhage occurred on December 1 while the employee was receiving treatment for her injury in the office of Dr. Johnson. When she came under Dr. Bell's care, he concluded from his examination that she had sustained a brain

hemorrhage. He performed a spinal tap which confirmed this diagnosis. Subsequent dye studies revealed the source of the brain hemorrhage, but before corrective surgery could be performed, the patient sustained a stroke of paralysis, becoming paralyzed on the left side. Dr. Bell stated that the brain injury was irreversible, not correctable by surgery, and that the patient was totally, permanently disabled.

Dr. Bell testified:

"In this particular instance, her stroke was due to a brain hemorrhage caused, in my opinion, by her being upset or excited with someone working on a wound where she had had surgery on her ankle and ran her blood pressure up probably and blew out an aneurysm she had. No doubt the aneurysm had been there for a number of years possibly or probably."

Further, he stated:

"And, in my opinion if she had not had to be there having somebody probe her foot or ankle, irrespective of what caused the ankle, I think that she became excited, her blood pressure did go up and she did sustain a brain hemorrhage in his office while under treatment for an ankle injury, and that by her symptoms—she didn't know they were symptoms of brain hemorrhage—I asked her when did she start having headache, and she went into a even more picturesque and elaborate description and she really didn't realize, in my opinion, that that was the moment she had had the hemorrhage. She went home and continued to complain of pain and vomiting due to the pressure increase in her brain and the irritation of the blood over her brain.

"Q. So, Doctor, from the history that you received from Mrs. White as to her injuries in her own personal examination, is it or is it not your opinion that the hemorrhage to her sub-arachnoid area is or is not causally connected to the injury she received to her ankle on or about November 1, 1975?

"A. I think they are connected in my opinion, as I just stated it."

The employer had Dr. Arnold M. Meirowsky, a highly qualified and widely known neurosurgeon of Nashville, Tennessee, to review "certain medical reports and medical depositions" concerning the employee. Exactly what documents or records Dr. Meirowsky examined does not appear in the record, but from those which he did examine, and in response to a hypothetical question, he concluded first that the onset of the subarachnoid hemorrhage did not occur on December 1, and that there was no causal connection whatever between the rupture of the aneurysm and the compensable injury or medical care resulting therefrom. We note from an examination of the record, however, that in the hypothetical question put to Dr. Meirowsky, there was no mention of the severe onset of neck stiffness which the patient experienced on December 1, and which all of the physicians, including Dr. Meirowsky, testified was a classic symptom of a subarachnoid hemorrhage.

Recovery was permitted for the death of an employee where an aneurysm of the aorta burst within an hour after he had sustained a severe injury to his finger in the case of *Lucey Boiler & Manufacturing Corp. v. Hicks*, 188 Tenn. 700, 222 S.W.2d 19 (1949). In that case there was testimony that the employee sustained severe pain together with excitement and anxiety from the injury to his hand, and that shortly after he had visited an attending physician, he suddenly died. Death was due to the rupture of a pre-existing aneurysm on the aorta, and there was medical testimony that an increase in blood pressure, resulting from excitement or tension, could cause such a rupture.

As in the *Hicks* case, *supra*, the trial judge in the present case was faced with conflicting expert testimony on the critical issue of causation. There was material evidence by qualified medical witnesses that such a connection did exist. Under well-settled rules governing the review of workmen's compensation cases, this Court will not disturb the findings and conclusions of the trial judge which are supported by such evidence.

The judgment of the trial court is affirmed at the cost of appellant, and the cause will be remanded to the trial court for entry of such further orders as may from time to time be necessary or appropriate.

COOPER, C. J., and FONES, HENRY and BROCK, JJ., concur.